UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In the matter:

      CF Beef & Grain, LLC,            Case No. 18-20898-beh

          Debtor.                    Chapter 12

**MEMORANDUM DECISION ON CONFIRMATION
OF DEBTOR'S FIRST AMENDED CHAPTER 12 PLAN**

In this case, the Court must balance giving the Debtor an opportunity to confirm its plan to reorganize and keep its farm in operation, against preserving the fair treatment of its creditors and the integrity of the bankruptcy process. *See In re Pertuset*, 492 B.R. 232, 237 (Bankr. S.D. Ohio 2012). Here, that balance tips against confirmation, because the Debtor's plan is not feasible, and implicitly rests on a closely related LLC continuing to default on its obligation to one of the Debtor's secured lenders, among other shortcomings.

The Debtor, CF Beef & Grain, LLC ("CF Beef"), filed a Chapter 12 petition on February 5, 2018. The three members of CF Beef are David J. and Patricia Clark, and one of their sons, Gregory J. Clark. Those same three individuals are the only members of another entity, CF Ag Services, LLC ("CF Ag"). The Clarks established CF Beef in approximately 2005 after a conversion from dairy farming. CF Beef is a cash crop operation in Dodge County, Wisconsin. It also does some custom drying and storing of grain. The Clarks established CF Ag in 2009 to provide custom chemical applications to farmers, as well as trucking of grain and livestock. The two LLCs work together, sharing the use of some equipment owned by CF Beef.

Both David and Patricia Clark, and their son Greg Clark, filed individual Chapter 7 cases before CF Beef filed the present case.[1] In his Chapter 7 case, Greg Clark included his personal liability to Markesan State Bank ("the Bank"). In each of the personal Chapter 7 cases, the Clarks listed the value of their two LLCs as $0. [2,3]

The Debtor filed a Chapter 12 plan of reorganization on May 7, 2018, to which numerous creditors objected. Thereafter the Debtor filed an amended plan on July 20, 2018, engendering a similar round of objections. The Chapter 12 trustee also filed an objection, and with it requested dismissal. The Court considered these objections, and the request for dismissal, at an August 13, 2018 confirmation hearing. In denying confirmation, the Court also will grant the request to dismiss but will stay entry of the dismissal order for 14 days to allow the Debtor an opportunity to convert its case to a Chapter 7 liquidation.[4]

## FACTS

When the Debtor was formed in 2005, its primary operations were cattle and cash crops; it also did some custom drying. In 2016, the Debtor stopped "running cattle" and sold its livestock, which it has not replaced. The cash crop operation peaked in 2016, with the Debtor farming about 1,700 acres (an expansion of 800 to 1,000 acres over what it farmed in 2005). But

---

[1] David and Patricia filed their Chapter 7 case on October 5, 2017, Case No. 17-29867. They received their discharges on January 24, 2018. Greg Clark filed his Chapter 7 case on the same date, October 5, 2017, Case No. 17-29868. He received a discharge on February 1, 2018.

[2] On their Chapter 7 schedules, David and Patricia noted that their farm/homestead was located on five separate parcels totaling 240 acres. Case No. 17-29867, CM-ECF Doc. No. 16, at 3. On their amended schedules, the Clarks listed the value of their interest in CF Beef & Grain LLC as $0.00 and the value of their interest in CF Ag Services LLC as $0.00. *Id.;* Doc. No. 27, at 8.

[3] On his Chapter 7 schedules, Greg Clark noted that his farm/homestead was on 93 acres, that the fair market value of the house was $75,000, $550,000 for the outbuildings, and that 90 acres of tillable land was worth $540,000 or $6,000 per acre. Case No. 17-29868, CM-ECF Doc. No. 14, at 3. On those same schedules, he listed the value of his interest in CF Beef & Grain LLC as $0.00 and the value of his interest in CF Ag Services LLC as $0.00. *Id.* at 7.

[4] Based on the Court's determination that dismissal of this Chapter 12 case is appropriate, the Court will take no action on the Chapter 12 trustee's pending objection to the late-filed claim of Helena Agri-Enterprises, LLC, or the response thereto. *See* CM-ECF Doc. Nos. 107 & 109.

compounding financial problems over recent years, including a 2012 drought that limited yields, a wet spring in 2013, a market downturn, and the Debtor's failure in 2017 to obtain a line of credit for crop inputs meant a reduction in the number of acres the Debtor could rent.[5]  In 2018, the Debtor planted around 1,060 acres, just less than 700 fewer acres than in 2016.

The Debtor's plan projections rely on four different sources of income: crop income; agricultural program payments; cash infusions from CF Ag; and income from custom drying and storing grain:

### CF BEEF & GRAIN, LLC - 3 Year Cash Flow Projection - AMENDED

7/18/2018

| Income | | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| | Crop Income | $ 654,415.00 | $ 674,050.00 | $ 694,275.00 |
| | Ag Program Payments | $ 39,550.00 | $ 40,735.00 | $ 41,960.00 |
| | Annual Cash infusion: CF Ag, LLC | $ 125,000.00 | $ 125,000.00 | $ 125,000.00 |
| | Custom drying and storing grain | $ 28,000.00 | $ 28,000.00 | $ 28,000.00 |
| | Total Income | $ 846,965.00 | $ 867,785.00 | $ 889,235.00 |

CM-ECF Doc. No. 81, at 12.

The Debtor's anticipated crop income of approximately $654,000 in 2018 is based primarily on sales of corn.  *See* CM-ECF Doc. No. 93, at 178.  The Debtor anticipates selling 100,440 bushels—mainly to ethanol plants—at $3.75 per unit, resulting in sales of $376,650.  *Id.*  Greg Clark testified at the confirmation hearing that the sale price for corn was "down" from the $3.75 figure included in the projections, estimating that the Debtor would be able to sell its corn to ethanol plants for about $3.40 to $3.45 a bushel before the end of the year.  One of the Debtor's unsecured creditors, Mr. Philip Majerus (d/b/a Kountry Korners), testified that current corn prices ranged from $3.30 to $3.40 per bushel, and that the projected sale price of $3.75 on which the Debtor's 2018 crop income was based would not be possible until early next year.

---

[5]  The Bank did not renew its line of credit with the Debtor, because the Debtor owes it more than $2.9 million.  Greg Clark could not say when the Debtor first defaulted on that loan.

The Debtor operates its grain drying and storing business—projected to bring in $28,000 in yearly income—out of real estate owned personally by members David and Patricia Clark. The Bank's loan to the Debtor is secured by this real estate. David and Patricia own approximately 228 tillable acres, and their land includes their 150-year old house and the grain drying equipment. It also has a barn, a machine shed, and a secondary cattle facility. The Clarks have a personal mortgage on the land for approximately $287,000. They rent all their tillable land to the Debtor at no charge. The Bank recently filed a foreclosure action against them.

Greg Clark owns approximately 87 acres, with several buildings on it—two livestock buildings and machine sheds, in good repair. He rents his tillable acres to the Debtor at no charge. The Bank's loan to the Debtor also is secured by this real estate. Greg Clark's personal loan balance with the Bank is $1,465,000, and the Bank recently filed a foreclosure action against his property. The Farm Service Agency ("FSA") also has a lien on Clark's property.

Greg Clark admitted that if the foreclosures proceed, the Debtor will have about 300 fewer acres with which to generate crop revenue. Clark testified that the Debtor could seek other land to rent, and estimated such costs at $60,000 per year, or between $175-225 per acre. Even if the Debtor had the financial ability to incur the additional expense of leasing (inferior)[6] replacement acres, those substitute acres would not necessarily have the same structural features. The Debtor has derived approximately $28,000 to $33,000 annually over the past couple years from its custom drying and grain storage. The potential loss of David and Patricia Clark's land through foreclosure jeopardizes the grain drying operation and $28,000 in projected annual income, as well as other structures which house machines used in the Debtor's operations. Greg Clark testified that there are two other Clark brothers with scattered small acreage

---

[6] Mr. Majerus, a property owner and an auctioneer who owns a gas station named Kountry Korners, testified that David and Patricia Clark's land was known as "the best farm in the Town of Leroy" and that the tillable land could be sold for $10,000 per acre, though acknowledged he hadn't been on the farm itself in the last several years. Mr. Majerus openly conceded he would like the opportunity to be the auctioneer or agent selling the land.

that could house the equipment. The equipment wouldn't be under a roof, but they would have a shop for maintenance. No other Clark brothers testified. Finally, if the Bank foreclosed on all three members' property, Greg Clark said the Debtor would defend the action, but he did not describe what any defense to foreclosure would be.

Greg Clark is the primary decision-maker of the Debtor and does not work off farm. David Clark is retired, but according to Greg is "100% active" physically with the Debtor's operation. He receives Social Security. David does some trucking for CF Ag and field operations. Patricia is the bookkeeper for both CF Beef and CF Ag, but is not paid for that work. She has an off-farm job. Greg's brother Tony Clark works full-time as CF Ag's only paid employee but also helps the Debtor with equipment and operations. There are some family members who assist, unpaid. If the Debtor's operations required more labor, the Debtor would have to pay for part-time labor. These expenses have not been factored into the Debtor's plan.

Greg Clark described how, as the Debtor was reducing the acreage it planted, CF Ag also went through some changes. The Clarks were advised to spread their overall risk, and so, through the CF Ag entity, they do planting, tillage, combining, chopping, grain trucking, and livestock trucking for others. CF Ag uses some equipment that the Debtor owns. As compensation for that use, as well as for some land leases, Clark said "funds are infused back." The Plan projects that CF Ag will pay the Debtor $125,000 yearly, but so far in 2018, CF Ag has contributed only $51,000 to $52,000. There is no written contract that commits CF Ag to make payments to the Debtor.

The evidence concerning CF Ag's ability to make annual cash infusions of $125,000 to fund the Debtor's plan is troubling. The three-year cash flow projection for CF Ag attached to the Debtor's plan anticipates gross income of $264,000 for 2018 (and net income of $126,686—just over the amount of the cash infusion), with a 3% per year increase for 2019 and 2020. *See* CM-ECF Doc. No. 81, at 13. The gross income projections include revenue for trucking grain ($21,000), trucking cattle ($180,000), and custom field work ($63,000).

Greg Clark testified in support of these projections. He estimated that CF Ag has 10-12 grain trucking customers, averaged over the last two years, and stated that CF Ag has been asked to do some extra trucking this coming fall. Projections for the grain trucking income are based on historical numbers, plus additional income for the "extra" trucking. He said there are land owners willing to work with them, who understand the Clarks are "in a rough spot." Clark's projections for custom field work also are based on historical numbers. Clark took last year's clients, and his knowledge of what they will be doing in the coming year, in terms of tilling, planting, chemical application, harvesting, chopping, etc.

Greg Clark's projections for income from cattle trucking, $180,000, are based on monthly revenue through August 2018. CF Ag has been focusing on cattle trucking since only March or April of 2018. The Debtor's income from CF Ag has grown each month, and Clark expects that to continue. Clark characterized this cattle trucking not as a new business venture, but a progression. He thought the cattle trucking would stabilize at $20,000 per month for the next five months. Mr. Majerus disputed Clark's projections, as that would mean 50 truckloads each month, at $400-500 per load. In Mr. Majerus' view, that amount of trucking was not possible. Mr. Majerus acknowledged that he has not done any cattle trucking himself, but has spoken with truckers at truck stops and his gas station, to get an estimate of $400 per load. Mr. Majerus also testified that the Debtor's projected fuel expense for CF Ag of $45,000 was not adequate to sustain 50 monthly truckloads. Greg Clark admitted his fuel projections may be too low, but thought that they were "close."[7] He acknowledged that CF Ag had spent $35,000 out of the projected $45,000 in fuel expenses as of the confirmation hearing, while CF Ag's sales so far were only $119,000 (out of the yearly projection for 2018 of $264,000). Together, this testimony undercuts the feasibility of the Debtor's plan.

---

[7] While Clark testified that the Debtor's decision to cease producing corn silage would reduce fuel expense somewhat, he agreed that CF Ag had shifted its operations to primarily trucking, implying an increase in fuel costs. The First Amended Plan does not reflect this shift.

The larger problem with CF Ag "infusing funds back" to the Debtor is that CF Ag also has an outstanding loan of $142,000 to the Bank, which is in default. Greg Clark acknowledged that if CF Ag were paying its obligation to the Bank, it would have no money to contribute to the Debtor, and that would materially impact the feasibility of the Debtor's plan. CF Ag took out its loan because CF Beef's borrowing was maxed out. CF Ag gave the Bank a security interest in all its assets, and given the current state of default, Clark acknowledged the Bank could replevin those assets. The Bank has not agreed to refinance or extend the loan payments with CF Ag. Clark testified that CF Ag will pursue other lenders to refinance, but he has not yet explored that option. The Court finds the potential for refinance speculative.

Additionally, while the Debtor projects that CF Ag will repay its (yet-to-be-refinanced or reamortized) loan to the Bank over seven years at $22,589 annually, the Court does not find that projection credible, given that CF Ag has paid the Debtor less than it projected thus far this year even, while defaulting on the Bank's loan, and the evidence supporting the anticipated increase in future CF Ag payments was unsubstantiated (only Greg Clark testified as to those, without offering signed contracts, or other farmer testimony, for example).

The Debtor projects paying $173,472 in land rent expenses for its crop farming, as actual money due on leases with landowners, if those leases are assumed. Some leases are paid in the spring. Some in the winter, using harvest proceeds. According to Greg Clark, $48,000 was due in Spring 2018, and CF Ag was going to give money to the Debtor to pay (for the leases). The Debtor has paid only $15,000 so far. Clark testified that the Debtor will make the rest of the lease payments after the anticipated CF Ag "cash infusion."

Greg Clark will be doing custom cattle raising for another party pursuant to a contract for services, though he is unsure if that will work out. Clark started this work in April 2018. But, he noted, it is hard to locate feeder cattle in the summer. He is working with a client to get some feeder cattle to raise in early September. Clients reimburse him for the feed. The cattle raising facility

is on the property he owns. He recognizes that if he does not have a way to pay the Bank, it could foreclose on the real estate. That would affect 87 acres used by the Debtor in its operations. To pay his personal expenses, Greg Clark takes a small draw from CF Ag Services, and in the last couple months has done some custom cattle work. But Clark admitted on cross-examination that he is not being paid for his work.

The Debtor intends to pay secured creditors in full. There is a 25-year amortization on the Bank and FSA loans, because both are secured by real estate owned personally by members of the Debtor LLC. There is a 7-year amortization on the other secured debt, because the collateral for those obligations is equipment. Greg Clark said he based the 7-year amortization on the expected life of the equipment, either seven years or beyond ("for a couple pieces, definitely beyond"). The seven-year balloon payment to the Bank is reasonable, according to Clark, because it allows time to pay down other debt and improve the Debtor's equity position. All assets of the Debtor are fully encumbered by debt to its secured creditors.

Greg Clark testified that the plan will pay about $3,000 per year to unsecured creditors, although the trustee stated at the confirmation hearing that her calculations resulted in about $5,000 per year to unsecured creditors.

The Debtor prepared and filed an updated liquidation analysis shortly before the confirmation hearing. *See* CM-ECF Doc. No. 98, at 4. It includes all of the Debtor's assets, all secured debt and all of the three members' real estate. The analysis projects $0 available to unsecured creditors in a hypothetical liquidation. The analysis includes some deduction for fair market value of assets, such as vehicles. Greg Clark testified that he used selling costs, some estimated clean up, auction commission, and flash sale estimates. He did not include realtor commissions for projecting sale of the real estate. He explained that the 25% discount he used is based on auction costs, an estimate of commission and clean up before sale, plus 10% on real estate. Mr. Majerus disagreed with Clark's use of 25% as the discount rate to use for fair value determination of the Debtor's equipment. He considered 10% to be more

appropriate, and testified that he did his own last farm machinery auction in April, 2018. He did generally agree with the fair market (pre-discount) values of the equipment included in the analysis. Majerus also disputed the 10% discount applied to the real estate, believing that 6% was more reflective of a broker's commission. In Majerus' opinion, if the debtor had calculated accurately the liquidation value of the property at issue, it would reflect money available to pay unsecured creditors. The Chapter 12 trustee also believed that an accurate liquidation analysis would show money available for unsecured creditors.

## DISCUSSION

To be confirmed, a Chapter 12 plan must meet the requirements of section 1225 of the Code. Section 1225(a) provides, in relevant part:

(a) Except as provided in subsection (b), the court shall confirm a plan if--

. . .

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan--

(A) the holder of such claim has accepted the plan;

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder;

> (6) the debtor will be able to make all payments under the plan
> and to comply with the plan . . . .

11 U.S.C. § 1225(a).

The Debtor has the burden of proving compliance with these requirements by a preponderance of the evidence. *In re Johnson*, 581 B.R. 289, 295 (Bankr. W.D. Wis. 2018). The Chapter 12 trustee and several creditors have challenged the plan's compliance with each of the provisions above. Specifically, the trustee, Jacobson Farmers Supply, Inc. ("Jacobson"), and Mr. Majerus claim that the plan was not proposed in good faith as required by subsection (a)(3) and that it fails the "best-interest" test of subsection (a)(4); the Bank, Deere & Co. d/b/a John Deere Financial ("John Deere"), and Farm Credit Service of America, PCA ("FCSA") claim that the plan does not satisfy subsection (a)(5); and the trustee, the Bank, Jacobson, and Mr. Majerus claim that the plan is not feasible under subsection (a)(6). Although the FSA did not challenge the plan's feasibility in its written objection, it echoed the concerns of other creditors at the August 13 confirmation hearing. In addition, the FSA asserts that the plan gives preferential treatment to other creditors to its detriment by consolidating its three loans into a single loan (with one interest rate and one term), potentially subordinating its real estate liens to the Bank's consolidated lien on all security.

As explained below, the Debtor has not met its burden to establish that the plan is feasible or that it meets the "best interest" test, and therefore the Court cannot confirm the plan.

## 1. Feasibility and 11 U.S.C. section 1225(a)(6)

To determine whether the plan meets the feasibility requirements of 11 U.S.C. section 1225(a)(6), the Court must "carefully scrutinize the proposed payments in light of projected income and expenses and consider whether they are based upon realistic and objective facts and whether they are capable of being met." *In re Szudera*, 269 B.R. 837, 842 (Bankr. D. N.D. 2001). Based on the record, the Court cannot conclude that the plan is feasible. The plan

requires the Debtor to make yearly payments of at least $297,979.53 to the Chapter 12 trustee, beginning on December 31, 2018. Of this amount, $125,000 will come from CF Ag, as a "cash infusion." The evidence does not support CF Ag's ability to make these payments to the Debtor. Testimony at the confirmation hearing suggested that CF Ag's expenses were understated, while its income was overstated. For example, Mr. Majerus testified that he believed CF Ag's fuel expenses of $45,000 are too low, and that the anticipated monthly trucking income of $20,000 was based on an unrealistically high number of truck loads. On cross-examination, Greg Clark conceded that the fuel projections may be understated. Greg Clark's ability to reliably predict CF Ag's income and expenses for cattle trucking also is diminished by the fact that this is a fairly new business opportunity—which CF Ag began in March or April of 2018—meaning there is limited historical data for comparison. Yet this new venture will be CF Ag's primary focus, accounting for more than two-thirds of its projected yearly income.

But the bigger problem is that CF Ag's cash infusions to the Debtor will come at the expense of the Bank. Greg Clark conceded that CF Ag is not paying its loan to the Bank, which has fully matured. He also admitted that if CF Ag *were* paying its loan to the Bank, it would have no money to provide the necessary cash infusions to fund the Debtor's plan. Clark suggested that CF Ag could refinance the loan with another lender, but acknowledged that he had not yet explored refinancing options. Any refinancing is hypothetical at this point, and the Court cannot speculate about possible alternate repayment scenarios. The evidence presented leads the Court to only one conclusion: CF Ag will be unable to pay the Debtor the $125,000 needed to fund the plan by December 31, 2018 unless it continues to default on its loan to the Bank. The Court cannot condone one default as a means to cure another. Moreover, CF Ag's continued default puts its assets at risk of a replevin action by the Bank, which Clark testified would mean the loss of equipment necessary for grain trucking.

Setting aside the uncertainty of the cash infusions from CF Ag, there are other reasons to question the feasibility of the plan. David and Patricia Clark's land—where CF Beef operates its custom drying and storing business—is in foreclosure. Although Greg Clark testified that the Clarks would oppose the foreclosure, he did not identify any defenses to the action. The loss of the grain drying and storage facilities would mean a significant loss of revenue, projected to be $28,000 per year. The loss of the land also means loss of buildings for equipment storage. While Greg Clark testified that his brothers may be able to house some of CF Beef's equipment on their land, the equipment would not be fully enclosed. And Greg Clark's brothers did not appear to testify about these possible alternatives to the first amended plan and potential foreclosures. CF Beef also farms 228 acres of David and Patricia Clark's land. Loss of this acreage—which Mr. Majerus described as the best in the county—means either a reduction in crop income, or increased expenses to rent additional land. Greg Clark estimated costs to rent land would be at least $175 an acre, which comes to an additional $39,900 in expenses.

Greg Clark's land also is in foreclosure. His testimony raises questions about his ability to meet his own personal expenses, including his mortgage. He takes only a small draw from CF Ag for himself, and conceded on cross-examination that he is not being paid for his work. While Clark is hopeful that his custom cattle raising business will succeed—he identified it as a "defense" to the foreclosure action—as of the August confirmation hearing his expectations for the business improving in the Fall were speculative. The loss of Greg Clark's land means a loss of 87 farming acres for CF Beef—and again, either a reduction in crop income, or increased expenses to rent additional land (over $15,000).

Further undercutting the Court's confidence in the Debtor's cash flow projections and its ability to make plan payments is the apparent overestimation of income from corn sales for 2018. Greg Clark acknowledged that the sale price for corn was "down" from the $3.75 per bushel used in the cash flow projections, and estimated that the ethanol plant(s) to which CF Beef

sells its corn would buy the crop for about $3.40 to $3.45 a bushel. Mr.
Majerus testified similarly. A lower sale price for corn means a reduction in
2018 crop income by at least $30,000.

Taking all these factors together, the Court cannot conclude that the
Debtor's cash flow projections are reasonably possible. In sum, the Debtor has
failed to show that the plan is feasible.

**2.      Treatment of Unsecured Claims and 11 U.S.C. section 1225(a)(4)**

As with the safeguards for secured creditors, Chapter 12 also provides
certain protections for unsecured creditors. A confirmable Chapter 12 plan
must comply with 11 U.S.C. section 1225(a)(4). This section, known as the
"best interest of creditors" test, "denies confirmation to any plan which
provides unsecured creditors with less compensation than they would receive
upon liquidation of the farm." *Matter of Fortney*, 36 F.3d 701, 704 (7th Cir.
1994). To determine whether a proposed plan satisfies this test, the Court
must

> perform[] a hypothetical liquidation analysis taking into account
> the value of the property available to creditors as of the effective
> date of the plan and then compar[e] that value to what each
> creditor will be receiving under the plan as proposed. The plan
> may be confirmed only if the present value of the proposed
> payments at least equal the likely distribution from the
> hypothetical liquidation.

*In re Novak*, 252 B.R. 487, 491 (Bankr. D.N.D. 2000). *See also* 8 COLLIER ON
BANKRUPTCY ¶ 1225.02[4] at 1225-8 (Richard Levin & Henry J. Sommer, eds.,
16th ed.).

One difficulty in determining whether the Debtor's plan satisfies the best
interest test is that neither the plan itself nor the attached financial projections
expressly state the amount of money that will be paid to unsecured creditors.
Greg Clark testified that the plan will pay about $3,000 per year to unsecured
creditors, while the trustee stated at the confirmation hearing that her
calculations showed payment of about $5,000 per year. Further confusing
matters is the Debtor's projected yearly expense of $30,000 for "professional

fees," which may reflect a double-counting of trustee fees—but the testimony concerning this expense was unclear. And it is the Debtor's burden to prove that its plan satisfies the best interest test.

After reviewing the liquidation analyses that the Debtor has filed in this case, as well as the testimony and arguments at the confirmation hearing, the Court cannot conclude that the Debtor has met this burden. The Debtor submitted two different liquidation analyses in support of its plan, both of which appear to contain flaws. The first liquidation analysis was filed as an attachment to the Debtor's July 20 plan, and included the value of David and Patricia's land along with the Debtor's assets, as well as the Debtor's debts. *See* CM-ECF Doc. No. 81, at 11.[8] This first analysis calculated available equity after satisfying secured claims (and accounting for a $150,000 homestead exemption) of $225,150.05. It did not account for the Bank's mortgage securing the personal debt of David and Patricia Clark, which presumably has priority over the mortgage securing the Bank's claims against the Debtor.

Shortly before the confirmation hearing, the Debtor filed an amended liquidation analysis. This analysis contained a few changes: the value of the Bank's debt was increased from $2,905,270.77 to $2,957,801.94; Greg Clark's land was included in the calculation of assets; and the personal debts of Greg, David, and Patricia Clark, secured by mortgages to the Bank and the FSA, were included in the overall debt calculation. The new liquidation analysis showed assets worth $4,936,290.24, secured by debts of $5,482,343.97—in other words, no equity for unsecured creditors. But there is (at least) one problem with the new liquidation analysis: the debt is inflated artificially by including the *unsecured* portion of Greg Clark's personal obligations to the Bank and the

---

[8] In this case, the Chapter 12 trustee, as well as Jacobson, assert that the equitable doctrine of marshaling would apply in a Chapter 7 case, *see In re Wm. Pietsch Co.*, 200 B.R. 207, 209-10 (Bankr. E.D. Wis, 1996), meaning that the Court must consider the property of the individual Clark family members securing the debts of CF Beef. If marshaling were required in a Chapter 7 liquidation, Markesan State Bank and the Farm Service Agency would have to collect against the real estate owned personally by Greg, David and Patricia Clark before satisfying their claims against the assets of the Debtor.

FSA.[9]  The assets of CF Beef cannot be used to satisfy Greg Clark's personal debts and any "unsecured" deficiency does not belong in a liquidation analysis of the Debtor's estate.

Setting aside the erroneous debt calculation—which overstates debts by around $580,000 by including Greg Clark's personal, "unsecured" debt—the Chapter 12 trustee and unsecured creditors also argue that the Debtor undervalued equipment and real property by using excessive discount rates. The Debtor chose a 25% discount rate for its equipment, which Mr. Majerus testified was inappropriate.  Based on his experience with equipment auctions, Mr. Majerus believed a 10% reduction was standard.  The trustee also asserted that a 25% discount was too high.  Using a 10% discount instead of a 25% discount results in a value increase of approximately $260,000.  For real property, the Debtor used a discount rate of 10%, which similarly drew criticism.  If a 6% discount rate were applied instead, that would result in a value increase of just over $100,000 (to David and Patricia Clark's property). In sum, the testimony suggests that the Debtor's liquidation analysis overstated debts and undervalued assets, thereby misstating the dividend that unsecured creditors would receive in a hypothetical liquidation.  Based on the numbers above, that amount appears to be more than the $15,000 Greg Clark testified would go to unsecured creditors.

On this record, the Court cannot conclude that the plan provides unsecured creditors with at least as much as they would receive in a Chapter 7 liquidation.

### 3. Should the Debtor's Case be Dismissed?

"The decision to dismiss a Chapter 12 bankruptcy petition is within the sound discretion of the bankruptcy court." *In re Johnson*, 581 B.R. at 299 (internal quotation marks omitted) (quoting *Keith's Tree Farms v. Grayson Nat. Bank*, 535 B.R. 647, 654 (Bankr. W.D. Va. 2015)).  There is no motion to

---

[9] Greg Clark's property is valued at $1,048,500, while the personal obligations that it secures total approximately $1,629,400.

dismiss pending before the Court, but the trustee did pose dismissal as an alternative request in her objection, and creditor Mr. Majerus joined in that request. Moreover, "'[s]ection 305(a) provides that the Court may dismiss a case under the Bankruptcy Code at any time if the interests of creditors and the debtor would be better served by such dismissal,'" and "the Court may find cause to dismiss where debtor 'lack[s] the ability to propose a confirmable Chapter 12 plan.'" *Id.* (quoting *In re Coram Graphic Arts,* 11 B.R. 641, 645 (Bankr. E.D. N.Y. 1981); *In re Mosbrucker,* 227 B.R. 434, 438 (8th Cir. BAP 1998), *aff'd,* 198 F.3d 250 (8th Cir. 1999)).

The trustee argues that dismissal is warranted here because the ability to fund the plan is so speculative that it is unclear how the Debtor could propose a confirmable plan. *See* CM-ECF Doc. No. 101 (audio recording of 8/13/2018 confirmation hearing) ("[I]n this case, the ability to fund the plan is so speculative that, should the Court determine that *this* plan should not be confirmed, I don't know what the Debtor would propose next to get to a confirmable plan."). In her written objection to confirmation, she highlighted that the Debtor responded to the seven objections to its original plan with only minor "cosmetic" changes, filing an amended plan that garnered another seven objections. The amended plan failed to remedy many of the problems identified in the original plan, and the record lacks any credible basis for the Court to conclude that the Debtor can propose a confirmable plan in a reasonable period of time.

The plan's success hinges on the non-occurrence of a number of very likely contingencies. For example, the foreclosure of David and Patricia Clark's property will result in a loss of at least $28,000 in yearly income from the Debtor's custom grain drying and storage operation. It also will result in the loss of 228 acres of farmland. While a decrease in the amount of land farmed will mean a decrease in related expenses such as fuel, there was no testimony concerning the amount of cost-savings from less farming, or how those savings would offset what likely will be a significant amount of lost crop income. The

loss of Greg Clark's land to foreclosure also will mean the loss of 87 acres of farmland. And according to Greg Clark, the Debtor would need at least $50,000 to rent an additional 300 acres to replace the Clarks' lost farmland. The foreclosures represent a potential loss of almost a third of the income needed to fund the plan.

The failure to prepare for the foreclosure contingencies—or at least credibly explain how the Debtor will manage them successfully—is fatal to the Debtor's plan. But it is not the only problem. Based on the evidence presented at the confirmation hearing, and as explained above, the Debtor will need to increase payments to unsecured creditors to satisfy the best-interest test of section 1225(a)(4). In addition, although the Court did not make any final determinations on the secured creditors' objections under section 1225(a)(5), an amended plan likely will have to increase payments to those creditors as well.[10]

The hardest hurdle for the Debtor to overcome is the plan's reliance on the cash infusions from CF Ag. With no current prospects for refinancing CF Ag's overdue loan to the Bank, and the admitted inability of CF Ag to pay both the Bank loan and the cash infusions to the Debtor, it is unclear how the Debtor will be able to propose a confirmable plan. The feasibility of the plan already strains credibility, and this problem will only be exacerbated in another amended plan, which will require the Debtor to find other sources of income and increase its plan payments. Based on the record, it will not be possible for the Debtor to do so. Dismissal is appropriate now, before additional time and resources are spent in this case, to the detriment of the estate and creditors.

---

[10] Both the Bank and FCSA objected to the 5.5% interest rate the Debtor proposed in repaying their claims as insufficient. While the Court need not rule on that issue now—particularly given the minimal evidence and argument devoted to subsection (a)(5) at the confirmation hearing—it is doubtful that an interest rate only .5% over the current prime rate of 5% would be adequate in the circumstances. An increased interest rate means increased plan payments.

## CONCLUSION

The Court will deny confirmation of the Debtor's plan because the Debtor has failed to establish that the plan is feasible or that it pays unsecured creditors at least the amount they would receive in a Chapter 7 liquidation. Because the Court finds that the Debtor will be unable to confirm a plan within a reasonable period of time, the Court also will dismiss this case. Dismissal will be stayed for 14 days to allow the Debtor to convert to a Chapter 7 liquidation.

The Court will enter a separate order consistent with this decision.

Dated: September 18, 2018

By the Court:

Beth E. Hanan
United States Bankruptcy Judge